IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EFL GLOBAL LLC,

              Plaintiff,

    v.

UBER FREIGHT LLC,

              Defendant.

Case No.  25-cv-07214-CRB

**ORDER GRANTING MOTION TO DISMISS**

This case arises from two cargo thefts in early-2025, in which unknown individuals impersonating authorized carriers obtained valuable freight shipments arranged through Defendant Uber Freight LLC's ("Uber Freight") online freight brokerage platform. Plaintiff EFL Global LLC ("EFL"), a freight forwarder and logistics company, alleges that Uber Freight's failures to verify carrier identity, maintain adequate platform security, and to ensure employee oversight, caused EFL to suffer losses of $713,769.23 due to the stolen cargo.

EFL brings five causes of action: breach of contract, negligence, gross negligence, declaratory relief, and breach of the implied covenant of good faith and fair dealing.  Uber Freight moves to dismiss the complaint in its entirety.

For the reasons set out below, the Court **GRANTS** Uber Freight's motion to dismiss and **DISMISSES** the complaint in its entirety **WITH LEAVE TO AMEND**.[1]

---

[1] Pursuant to Civil Local Rule 7-1(b), the Court determines that these motions are suitable for resolution without oral argument.  The Court presumes familiarity with the factual allegations and applicable law.

## I.    BACKGROUND

### A.    Factual Background

EFL is a company headquartered in New York with its principal place of business in Florida.  FAC ¶ 2.  EFL is in the business of freight forwarding, cargo logistics, and shipping services.  Id.  EFL is not a California-based entity.  Defendant Uber Freight LLC ("Uber Freight") is a freight broker headquartered in Delaware with its principal place of business in California.  Id. ¶ 4.  Uber Freight engages in logistics coordination, freight brokerage, and transportation management services.  Id. ¶ 5.

#### 1.    Lululemon Shipment

In February 2025, EFL contracted with Uber Freight to arrange truck brokerage services to transport a container of Lululemon apparel from Los Angeles, California to Groveport, Ohio.  First Amended Complaint ("FAC") ¶ 21.  Uber Freight  prepared the load for delivery scheduled for February 19, 2025.  Id. ¶ 25.  On February 17, 2025, two days before the scheduled delivery, Uber Freight "allowed an imposter to pick up the load and released the load to the imposter."  Id. ¶ 26.  Uber Freight notified EFL the same day that an imposter had stolen the container.  Id. ¶ 27.  Lululemon subsequently filed a formal claim with EFL for $338,890.81, representing the value of the stolen merchandise, and EFL filed a formal claim against Uber Freight.  Id. ¶¶ 31–32.  EFL paid Lululemon $336,682 in November 2025 for the value of stolen merchandise minus the value of recovered items.  Id. ¶ 33.  The FAC alleges that Uber Freight failed to verify the identity of the trucker who arrived, failed to safeguard its internal computer systems against improper access and carrier impersonation, and failed to follow up with relevant transportation contractors to ensure that the correct entities accepted the pickup.  Id. ¶¶ 34–38.  EFL further alleges, on information and belief, that one or more Uber Freight employees or agents were involved in the theft, and that Uber Freight's online system had been subject to a data breach.  Id. ¶¶ 37–38.  No facts are alleged in support of either contention beyond bare assertion.

United States District Court
Northern District of California

### 2.    Urban Outfitters Shipment

In March 2025, EFL again contracted with Uber Freight to arrange the transport of a large Urban Outfitters shipment from Los Angeles, California to Reno, Nevada. Id. ¶¶ 39–40. On April 1, 2025, Uber Freight "allowed two different drivers who were impersonating carriers to pick up the two Urban Outfitters loads and released the two loads to the impersonators." Id. ¶ 43. The total value of the shipment was $377,087.23. Id. ¶ 44. Urban Outfitters filed a formal claim with EFL for that amount, and EFL filed a formal claim against Uber Freight. Id. ¶¶ 45–46.

Critically, unlike the Lululemon shipment, the FAC does not allege that EFL has paid Urban Outfitters any portion of its $377,087.23 claim. The FAC alleges only that the claim was filed and acknowledged. See FAC ¶¶ 45–52.

As with the first theft, EFL alleges on information and belief that Uber Freight employees or agents were involved and that Uber Freight's computer systems had been compromised. Id. ¶¶ 48–52. The FAC further alleges that Uber Freight failed to implement corrective safeguards after the first theft, demonstrating awareness of the risk and indifference to its recurrence. Id. ¶¶ 50–53.

### B.    The Agreement

In 2025, EFL contracted with Uber Freight for freight brokerage services by accepting Uber Freight's Shipper Platform Terms and Conditions of Service (the "Agreement"), a clickwrap agreement prepared by Uber Freight. Id. ¶¶ 11–12, Ex. A. EFL describes the Agreement as a "non-negotiable click the box contract." Id. ¶ 15.

The Agreement governed EFL's use of Uber Freight's online platform to, among other things, create shipments, receive price quotes, tender shipments to carriers, and track shipment details. See FAC, Ex. A at §§ 1.1, 2.1. The Agreement clearly states the services Uber Freight was to provide to EFL:

> § 1.1 Access to Services. Uber Freight will establish a Customer corporate account that will enable Customer to access the Platform and the Uber Freight Service that may be offered there from time to time.
>
> . . .

3

§ 2.1 Customer Account.  [. . .] The Platform will enable Customer to do one or more of the following (as may be available in the platform from time to time): (a) build shipments and receive price quotes from Uber Freight for the Uber Freight Service, (b) tender a shipment to Uber Freight, another broker, and/or a motor carrier and (c) view detailed shipment and shipment transportation information, which may include, without limitation, customer User name together with request time and date, information about the cargo and shipment, the name and other identifying information of the motor carrier and motor carrier driver performing the transportation services, location information of the motor carrier and/or motor carrier driver performing the transportation services, information about the equipment being used by the motor carrier to provide the transportation services, . . . Uber Freight personnel contact persons and their contact information . . . trip route, distance and duration, and the price charged by Uber Freight . . . .  Uber Freight reserves the right to add, remove and update features and functionality of the platform at any time.

FAC Ex. A at §§ 1.1, 2.1.

Several other provisions of the Agreement bear directly on the claims at issue.

Section 6 of the Agreement defines Uber Freight's role as a freight broker and expressly disclaims any liability for damaged or lost cargo:

Uber Freight LLC is a **federally licensed freight broker** . . . .

UBER FREIGHT IS NOT A MOTOR CARRIER.   NO INTERPRETATION OF WRITTEN OR ORAL REMARKS IN ANY AGREEMENT OR DOCUMENT SHALL BE CONSTRUED TO IMPLY UBER FREIGHT IS A MOTOR CARRIER.

. . .

The motor carrier shall be solely responsible for . . . (iv) any cargo loss or damage in accordance with applicable United States federal law up to $100,000 per shipment . . . . **Uber Freight does not assume any liability or financial responsibility for property or cargo**, including any loss, theft, damage or delayed delivery thereof.

Id. at § 6 (emphases added).

Section 7.3 provides, in all-capital letters, that Uber Freight offers its platform and services "'AS IS' AND WITHOUT WARRANTY." Id. at § 7.3.  The section also expressly disclaims any warranty that the platform or services will be "uninterrupted or error free." Id.

Section 8.1 caps direct damages recoverable against Uber Freight at $20,000 and

4

excludes any consequential, incidental, punitive, and special damages entirely.  Id. at § 8.1. The limitation does not apply to fees owed by the customer to Uber Freight or to "fraud or willful criminal acts."  Id.  EFL's complaint does not allege fraud or willful criminal acts. See FAC.

Section 10.1 designates Delaware law as the applicable law governing all disputes arising under the Agreement, except to the extent governed by applicable federal law.  Id. at § 10.1.  Section 10.2 provides that the Agreement "constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other agreements and understandings, both written and oral."  Id. at § 10.2.  The Agreement is therefore fully integrated.

### C.    EFL's Complaint

EFL's FAC asserts five causes of action, all premised on the same underlying events.

EFL's first cause of action alleges breach of contract arising from Uber Freight's supposed failure to perform its contractual obligations by, *inter alia*, failing to ensure its online platform was secure, failing to adequately vet carriers and employees, and releasing cargo to unauthorized parties without sufficient safeguards to prevent improper access. FAC ¶¶ 58–66.

EFL's second and third causes of action allege negligence and gross negligence respectively, asserting that Uber Freight breached a duty of care in its performance of freight brokerage services.  Id. ¶¶ 67–97.

EFL's fourth cause of action seeks declaratory relief invalidating two contractual provisions as unconscionable under California Civil Code §§ 1670.5 and 1668: (1) the Delaware choice-of-law clause and (2) the $20,000 liability cap.  Id. ¶¶ 98–104.

Finally, EFL's fifth cause of action alleges breach of the implied covenant of good faith and fair dealing, contending that Uber Freight's operational and security failures deprived EFL of the benefit of the Agreement and resulted in substantial damages.  Id. ¶¶ 105–13.

EFL filed its original complaint in August 2025. EFL filed its First Amended Complaint on November 25, 2025. Uber Freight subsequently moved to dismiss. Mot. (dkt. 25).

## II.     LEGAL STANDARD

A party may bring a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the Court accepts factual allegations as true and views them in the light most favorable to the plaintiff, "a formulaic recitation of the elements of a cause of action" and "naked assertion[s]" devoid of further factual backing are insufficient. Id.

## III.    DISCUSSION

### A.     Choice of Law and Unconscionability

#### 1.     Choice of Law

Before reaching the merits of EFL's claims, the Court must determine what state's laws govern this dispute. The Agreement states: "Except to the extent governed by applicable United States federal law, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its choice or conflict of law provisions." FAC, Ex. A at § 10.1. As explained below, federal law preempts a majority of EFL's causes of action. To the extent any claims survive federal preemption, the Agreement's Delaware choice-of-law provision governs, and the Court applies Delaware law accordingly. EFL's unconscionability challenge to the choice-of-law provision fails.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. Narayan v. EGL, Inc., 616 F.3d 895, 898 (9th Cir. 2010). Under California's choice-of-

law framework, contractual choice-of-law provisions are generally enforced provided that the chosen state bears a substantial relationship to the parties or the transaction, or there is any other reasonable basis for the parties' choice. Nedlloyd Lines B.V. v. Super. Ct., 3 Cal.4th 459, 465–66 (1992). A party's place of incorporation suffices to satisfy both prongs. See Nezri v. PayPal, Inc., 606 F. Supp. 3d 985, 991 (C.D. Cal. 2022) ("There is a substantial relationship between the parties and Delaware because PayPal was incorporated under the laws of Delaware."). Both parties in the instant case are incorporated under the laws of Delaware and thus the record establishes a substantial relationship with Delaware and a reasonable basis for the choice-of-law designation.

Where, as here, the threshold requirement is met, California courts enforce a choice-of-law provision unless the opposing party demonstrates that (1) applying the designated state's laws would contravene a fundamental policy of California, and (2) California has a materially greater interest than the chosen state in the resolution of the dispute. Nedlloyd, 3 Cal.4th at 466; LeBouef v. NVIDIA Corp., 2019 WL 13210428, at *6 (N.D. Cal. Nov. 18, 2019). Neither factor is met here.

On the first prong, EFL argues that California has a fundamental policy against enforcing unconscionable contracts, citing California Civil Code §§ 1670.5 and 1668.[2] These provisions, however, do not reflect some sort of unique rule inherent to California law — the statutes reflect general contract law doctrines empowering courts to decline to enforce unconscionable contractual terms. They do not represent a policy so fundamental to California that courts shall be compelled to refuse to honor a contractual choice-of-law provision, particularly where the designated state in the choice-of-law provision recognizes the same or a similar doctrine under statute and common law. See, e.g., Del. Code § 2-302 (empowering courts to refuse to enforce contracts or provisions that are found to be unconscionable). Federal courts sitting in diversity in California regularly apply Delaware

---

[2] California Civil Code § 1670.5 states that courts are not to enforce a contract or any clause of a contract found to be unconscionable. California Civil Code § 1668 states that policies that intend to defraud or cause willful injury are contrary to state policy.

law to similar claims for breach of contract, negligence, gross negligence, and breach of the implied covenant of good faith and fair dealing, without finding any contravention of fundamental California policy. See Chang Fang v. CMB Exp. Infrastructure Grp. 48, LP, 773 F. Supp. 3d 963, 980–81, 983, 984 (E.D. Cal. 2025) (upholding Delaware choice-of-law clause in case alleging negligence, gross negligence, breach of contract, and breach of the implied covenant of good faith and fair dealing).

Regarding the second prong, EFL also fails to demonstrate that California has a materially greater interest in this dispute relative to Delaware. The relevant factors include the place of contracting and performance, the location of the subject matter, and the domicile, residence, and place of incorporation of the parties. See Ruiz v. Affinity Logistics Corp., 667 F.3d 1318, 1324 (9th Cir. 2012). On balance these factors do not favor California. EFL emphasizes that Uber Freight's principal place of business is in California and that the cargo pickups occurred at California facilities. Opp'n (dkt. 27) at 10. These facts certainly establish some connection with California. But they do not tip the balance. Performance of a contract in California does not, without more, override a Delaware choice-of-law provision selected by Delaware-based entities providing services on a nationwide scale. See CLEAResult Consulting, Inc. v. EnerNOC, Inc., 2017 WL 4638592, at * (D. Del. Oct. 16, 2017) (assessing states' relationship to the dispute by weighing factors like the protection of justified expectations, predictability, ease, and where the injury took place). Uber Freight coordinates freight around the country – permitting the law of any state in which goods happen to originate to displace a negotiated choice-of-law provision would undermine the basic predictability such provisions are designed to provide.

Accordingly, the Delaware choice-of-law provision is enforceable, and Delaware law governs EFL's state law claims to the extent they are not preempted by federal law.

### 2. Unconscionability

The Court, as discussed above, applies Delaware law to evaluate EFL's unconscionability challenge to the Agreement's liability cap and choice-of-law provision.

Like California, Delaware law requires a showing of *both* procedural and substantive unconscionability. Rummel, Klepper & Kahl, LLP v. Del. River & Bay Auth., 2022 WL 29831, at *14 (Del. Ch. Jan. 3, 2022). EFL's challenge fails under this standard.

As to procedural unconscionability, Delaware courts focus on the "relative bargaining strength of the parties." Marina View Condo. Ass'n of Unit Owners v. Rehoboth Marina Ventures, LLC, 2018 WL 1172581, at *8 (Del. Ch. Mar. 6, 2018). Delaware courts are particularly "reluctant to find unconscionability in contracts between sophisticated corporations. Unconscionability is generally found where '[a] party with superior bargaining power used it to take unfair advantage of [its] weaker counterpart.'" Northern Data AG v. Riot Platforms, Inc. 2025 WL 1661855, at *16 (Del. Ch. June 2, 2025) (brackets in original). Here, EFL's procedural unconscionability theory rests on the allegation that the Agreement is a "non-negotiable click the box contract." FAC ¶ 15. But both parties are sophisticated commercial entities: EFL is a freight forwarding and logistics company that arranges cross-country transport of high-value goods, and Uber Freight is a nationally operational freight broker. The FAC contains no allegation that EFL lacked the ability to seek alternative freight brokerage services, or that it was subject to surprise or concealment of any particular contractual term. The mere fact that the Agreement was presented in a standard clickwrap format does not, without more, support procedural unconscionability. See Evans v. PayPal, Inc., 2023 WL 6058490, at *2 (9th Cir. Sept. 18, 2023) (mem.).

As to substantive unconscionability, Delaware requires that the challenged terms represent "a gross imbalance that 'shocks the conscience'" or that the terms appear "so extreme as to appear unconscionable according to the mores and business practices of the time and place." Rummel, 2022 WL 29831, at *14. The Agreement's liability cap and choice-of-law provisions are standard features of contracts. Not only is the limitation of liability provision standard, it appears in all-capital letters under a conspicuous heading. FAC, Ex. A at § 8.1. And the choice-of-law provision is unremarkable in light of the fact that it designates both parties' home state. Id. at § 10.1. EFL's conclusory allegation that

9

these terms are "highly substantively unconscionable," FAC ¶ 15, is insufficient to survive a motion to dismiss.

As a final note, the same result would arise under California law, which also requires some measure of both procedural and substantive unconscionability, and similarly does not treat clickwrap assent alone as sufficient for the procedural element. See Pandolfi v. AviaGames, Inc., 2024 WL 4051754, at *9 (N.D. Cal. Sept. 4, 2024) ("As noted above, under California law, there must be both procedural and substantive unconscionability in order for an agreement to be rendered invalid[.]"); Levin v. Caviar, Inc., 146 F. Supp. 3d 1146, 1157 (N.D. Cal. 2015) (finding clickwrap agreement enforceable).

Accordingly, EFL's declaratory relief claim — to the extent it relies on the alleged unconscionability of the Agreement's choice-of-law or liability limitation provisions — fails as a matter of law and is **DISMISSED**.

### B.    FAAAA Preemption

The Federal Aviation Administration Authorization Act ("FAAAA") was enacted to deregulate the trucking industry and prevent a patchwork of state laws from disrupting the interstate freight market. See Cal. Trucking Ass'n v. Su, 903 F.3d 952, 960–61 (9th Cir. 2018). To accomplish that goal, Congress included a preemption provision: "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law **related to a price, route, or service** of any . . . broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1) (emphasis added). The parties do not dispute that Uber Freight is a "broker" or "freight forwarder" under the terms of the FAAAA. See FAC, Ex. A at § 6 ("Uber Freight LLC is a federally licensed freight broker as defined by 49 U.S.C. § 13102(2)."); Mot.; Opp'n ("EFL is a freight forwarder and logistics provider."). Courts recognize a narrow exception, discussed below, for personal injury claims arising from motor vehicle collisions.

All of EFL's claims against Uber Freight arise from Uber Freight's performance of freight brokerage services, and the FAAAA's preemption provision applies broadly to Plaintiffs' claims.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1. Negligence and Gross Negligence Claims (Second and Third Causes of Action)

EFL's second and third causes of action allege that Uber Freight was negligent and/or grossly negligent in its performance of freight brokerage services by, among other things, failing to verify carrier identity, failure to secure its online platform against unauthorized access, and failing to adequately vet its employees. FAC ¶¶ 67–97. These claims arise directly from Uber Freight's conduct as a freight broker and are preempted by the FAAAA under Miller v. C.H. Robinson Worldwide, Inc., 976 F.3d 1016 (9th Cir. 2020).

The Ninth Circuit in Miller interpreted the phrase "related to" broadly, encompassing state laws "having a connection with or reference to . . . rates, routes or services, whether directly or indirectly." Miller, 976 F.3d at 1022 (internal quotation marks omitted). State tort law claims qualify as a "law, regulation, or other provision" under the FAAAA's preemptive scope. See id. at 1023–25. Thus, the Ninth Circuit held that a negligence claim against a freight broker for negligent selection of a motor carrier — which caused a traffic collision injuring the plaintiff — was preempted by the FAAAA because the claim arose from the broker's arrangement of transportation services. Id. at 1024–25. The court reasoned that the broker's service of selecting and engaging motor carriers is the core of what a freight broker does, and a negligence claim premised on that conduct has the requisite "connection with" the broker's services to trigger preemption. Id.

EFL argues that its negligence claims are "temporally and substantively distinct" from transportation services because they target Uber Freight's platform security and internal oversight practices rather than the movement of goods itself. Opp'n at 4. This argument overlooks the fact that the entirety of EFL's relationship with Uber Freight arose by virtue of a freight brokerage agreement entered into "for the transportation of property." 49 U.S.C. § 14501(c)(1); see also FAC ¶¶ 12–13 (stating that the parties entered into the Agreement "which provided in part that Uber Freight would provide freight brokerage services to EFL California" and that the Agreement "represents that Defendant arranges

11

for transportation by third-party motor carriers"). The online platform through which Uber Freight builds shipments, engages carriers, and tracks loads is merely the mechanism by which Uber Freight carries out its brokerage service — it is not a separate product. Separating the broker's platform from its brokerage function would risk reducing the scope of FAAAA preemption to the point of ineffectiveness.

Moreover, EFL's negligence allegations target the core of what Uber Freight does. EFL alleges that Uber Freight owed a duty to arrange transport by authorized carriers, failed to confirm the identity of the driver who arrived to pick up the shipment, and released cargo to an imposter. FAC ¶¶ 67–97. These are not allegations of pre- or post-transport conduct. These allegations concern the core functions that Uber Freight performs: selecting, engaging, and monitoring carriers in connection with transportation. Under Miller, such claims are preempted. EFL's reliance on Anderson v. Pour, 2014 WL 5699646, at *1–3 (N.D. Cal. Nov. 4, 2014), is thus misplaced. In Anderson, the court found a state law claim was not preempted because it concerned a logistics company's post-transport handling of a damage claim. Id. This conduct exclusively took place after the goods had arrived and transportation was complete. The court was careful to note that the plaintiff's claim "focuse[d] on [defendant's] processing of [plaintiff's] claim after the Camaro was no longer in transit," and that the plaintiff had pled his claim "to focus exclusively on those activities which took place after the service provided by the motor carrier ended." Id. at *5–6. Here, EFL's allegations concern conduct taking place during active transportation. That is a categorically different matter from Anderson.

Finally, the FAAAA contains a limited carveout providing that its preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." 49 U.S.C. § 14501(c)(2)(A). In Miller, the Ninth Circuit held that this "safety exception" preserved the plaintiff's negligence claim because that claim arose from a motor vehicle collision on a public state highway, which was precisely the kind of motor vehicle safety hazard the exception was designed to address. 976 F.3d at 1030–31. The court framed its holding narrowly: "We hold that negligence claims against brokers, to the

extent that they arise out of motor vehicle accidents, have the requisite 'connection with' motor vehicles.  Therefore, the safety exception applies to Miller's claim against C.H. Robinson." Id. at 1031.  That limiting language is critical to this dispute.

The FAC does not allege that the cargo thefts at issue arose from a motor vehicle collision on a public roadway.  The containers appear to have been stolen from private facilities, with no collision precipitating the theft.  Nor are public road safety hazards in any way implicated.  The safety exception to FAAAA preemption thus is not applicable.  This conclusion is consistent with recent, persuasive authority from courts in this circuit.  See Jeunesse, Inc. v. NTG Air & Ocean, LLC, 2025 WL 2020005, at *4 (C.D. Cal. June 17, 2025) (agreeing that claims "'arising out of the mere theft of cargo from a motor vehicle do not qualify" for the safety exception to FAAAA preemption) (quoting Minder v. Real Int'l SCM Corp., No. 2:23-cv-3292-DSF-PVC (C.D. Cal. Nov. 17, 2023)).  The court reasoned that Miller expressly limited the safety exception to claims arising from motor vehicle crashes or similar safety incidents, and that extending the exception to cargo theft would expand it beyond the terms of the Ninth Circuit's holding.  Id.  ("[E]ven under Miller's broad interpretation of the safety exception, the alleged theft of cargo here is not 'connected with' the regulation of motor vehicle safety." (emphasis in original)); see also Dainese USA, Inc. v. Coyote Logistics, LLC, 2025 WL 2958873, at *2 (C.D. Cal. Sept. 9, 2025) ("Plaintiff overstates the Ninth Circuit's holding in Miller, which only considered claims against brokers 'that stem from motor vehicle accidents." (emphasis in original)).

EFL relies principally on Milk Specialties Co. v. Sandair Corp., 753 F. Supp. 3d 1043 (E.D. Cal. 2024) and Megawatt Group, LLC v. Patterson Companies, Inc., 2024 WL 5372407 (C.D. Cal. June 14, 2024), both of which applied the safety exception to cargo theft claims that did not involve motor vehicle collisions.  To the extent those decisions extend the safety exception to claims arising outside the motor vehicle collision context, this Court finds Miller, Jeunesse, and Dainese more persuasive.  The purpose of FAAAA preemption is to prevent state law from imposing obligations on freight brokers that effectively regulate the price, route, or service of interstate freight transportation.  The

safety exception exists to preserve state police powers over a narrowly-defined concern: physical danger posed by motor vehicles on public roads. City of Columbus v. Ours Garage & Wrecker Serv., Inc., 536 U.S. 424, 426 (2002) (holding that the safety exception to FAAAA preemption "evinces a clear purpose to ensure that the preemption of States' economic authority over motor carriers of property 'not restrict' the preexisting and traditional state police power over safety, 'a field which the States have traditionally occupied'") (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)).  Reading the safety exception broadly to encompass any state law claim with some connection to motor vehicles or cargo brokerage could risk restoring the pre-FAAAA status quo, in contrast with Congress's intent.

Accordingly, the narrower reading of the safety exception honors both the text and purpose of the FAAAA, and EFL's second and third causes of action are therefore preempted by the FAAAA and therefore dismissed.  EFL's second and third causes of action are thus **DISMISSED**.

### 2.    Implied Covenant of Good Faith and Fair Dealing (Fifth Cause of Action)

EFL's fifth cause of action alleges that Uber Freight breached the implied covenant of good faith and fair dealing by failing to maintain adequate platform security, failing to vet carriers and employees, and otherwise performing the Agreement in bad faith.  FAC ¶¶ 105–13.

This claim is preempted by the FAAAA for the same reasons as the negligence claims.  District courts within the circuit have recognized that claims grounded in state-law-imposed duties, rather than the express terms of a contract, are preempted by the FAAAA because they effectively regulate the broker's services through the mechanism of state law.  The implied covenant of good faith and fair dealing is, by definition, a condition superimposed by state law onto contracts; it is not a term negotiated or agreed to by the parties.  As courts in this district have held: "Conditions implied by law are conditions imposed by law — state law; they are not negotiated by the contracting parties.  Claims

based on violation of the covenant of good faith are therefore preempted." Samica Enters., LLC v. Mail Boxes Etc. USA, Inc., 637 F. Supp. 2d 712, 720 (C.D. Cal. 2008).

EFL contends that its implied covenant claim targets Uber Freight's internal security failures rather than its prices, routes, or services, and it therefore falls outside the scope of FAAAA's preemption provision. Opp'n at 7 ("EFL's claim for breach of implied covenant of good faith and fair dealing is not preempted by the FAAAA because the FAC does not allege conduct related to prices, routes, or brokerage services within the meaning of the statute."). That argument fails for many of the same reasons discussed above in relation to EFL's negligence claims. Moreover, EFL cannot sever Uber Freight's platform operations from its freight brokerage services for preemption purposes while simultaneously premising its claim on Uber Freight's performance of its obligations under a freight brokerage agreement.

Accordingly, the Court **DISMISSES** EFL's fifth cause of action.

### C.    Alternative State Law Grounds for Dismissal

Even if the FAAAA did not preempt any of EFL's claims, many causes of action independently fail to state a claim upon which relief can be granted under applicable state law. As established above, Delaware law governs EFL's state law claims.

### 1.    Breach of Contract Claim (First Cause of Action)

To state a claim for breach of contract under Delaware law, a plaintiff must demonstrate: (1) the existence of the contract, whether express or implied; (2) the breach of an obligation imposed by the contract; and (3) damage to the plaintiff. VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003). Critically, the complaint must identify the specific contractual provision breached. See, e.g., Breakaway Sols., Inc. v. Morgan Stanley & Co. Inc., 2004 WL 1949300, at *11 (Del. Ch. Aug. 27, 2004) ("To survive a motion to dismiss, the plaintiff must identify which provisions or terms of the contract were breached by the conduct at issue."); Collins & Aikman Corp. v. Stockman, 2009 WL 1530120, at *31 (D. Del. May 20, 2009) ("A well-pleaded breach of contract claim must also identify the contractual provision or, at a minimum, the contractual duty

United States District Court
Northern District of California

that is alleged to have been violated."). EFL's breach of contract claim fails to state a claim under this standard.

The FAC premises Uber Freight's alleged breach on three general categories of failure: (1) failing to ensure or take reasonable steps to ensure that its online vendor system was secure; (2) failing to vet vendors, carriers, and third parties who had access to its system; (3) failing to vet its employees and agents to ensure they did not engage in improper activities; and (4) failing to put safeguards in place to prevent improper access, fraud, impersonation, or theft. FAC ¶ 61. None of these obligations appear in the express terms of the Agreement.

The provisions that EFL invokes as the source of these obligations — sections 1.1 and 2.1 — do not support such a broad reading of Uber Freight's obligations to EFL. Section 1.1 states that Uber Freight will establish a customer corporate account enabling EFL to access the platform. FAC, Ex. A at § 1.1. Section 2.1 enumerates the functions the platform will make available to EFL as the customer: building shipments, receiving price quotes, tendering shipments, and viewing shipment information. Id. at § 2.1. These provisions describe what EFL, as a customer, may receive as part of the deal. They say nothing about Uber Freight's security practices, carrier vetting standards, or identity verification procedures. See id. at §§ 1.1, 2.1. Inferring such obligations from these sections would require the Court to read into the Agreement certain duties that the Agreement omits and in fact affirmatively disclaims.

The Agreement's disclaimers of any such obligations are unambiguous. Section 6 states that Uber Freight "does not assume any liability or financial responsibility for property or cargo, including any loss, theft, damage or delayed delivery thereof." Id. § 6. Instead, it is the motor carrier, and not Uber Freight, that bears responsibility for cargo loss. Id. Section 7.3 provides that the Uber Freight platform and services are provided "as is," without warranty, and expressly disclaims any warranty that the platform will be uninterrupted or error free. Id. at § 7.3. These provisions are not ambiguous and do not leave open the implied obligations EFL asks this Court to apply. To the contrary, they

United States District Court
Northern District of California

foreclose any such obligations.

Under Delaware law, the express terms of a fully integrated contract govern, and courts will not imply obligations that contradict the written agreement. See Riverbend Community, LLC v. Green Stone Engineering, LLC, 55 A.3d 330, 334 (Del. 2012) ("When we interpret contracts, we 'give priority to the parties' intentions as reflected in the four corners of the agreement.'"). The Agreements' integration clause reinforces this conclusion. Section 10.2 provides that the Agreement "constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all other agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof." FAC, Ex. A at § 10.2. The FAC relies extensively on extracontractual representations allegedly understood by EFL to apply to Uber Freight, but those representations are superseded by the terms of the Agreement and cannot form the basis of a successful breach of contract claim under the circumstances presented here.

Accordingly, EFL's breach of contract claim is **DISMISSED**.

### 2. Negligence and Gross Negligence Claims (Second and Third Causes of Action)

Even setting aside FAAAA preemption, EFL's negligence and/or gross negligence claims fail under the economic loss rule. Under Delaware law, the economic loss rule generally prevents recovery in tort when a plaintiff suffers only economic loss in connection with a contract. See Byborg Enters. S.A. v. Vertex, Inc., 2025 WL 1911338, at *4–5 (Del Super. Ct. July 11, 2025). For a tort claim to survive along a contract claim, the plaintiff must allege that the defendant breached "a duty independent of the contract." Id. at 4. "The mere fact that a tort claim uses different language or invokes a different theory does not suffice if the duty allegedly breached is ultimately one created by contract." Id.

EFL's negligence claims are a restatement of its breach of contract theory. The FAC alleges that Uber Freight owed EFL a duty of care to "exercise reasonable care in arranging for the transport" of cargo and to take "reasonable steps to ensure that goods shipped remained safe and not subject to loss or damage." FAC ¶¶ 68–70. These claims

17

materially overlap with the breach of contract claim: "This agreement required Defendant Uber Freight to take reasonable steps to ensure that logistical requirements and specifications, including but not limited to ensuring or taking reasonable steps to ensure that the appropriate, authorized, legitimate carrier picked up the goods for transportation." Id. ¶ 59.  The FAC does not identify any duty independent of the Agreement.  Under Delaware law, such a re-labeling of claims is insufficient.[3]  Byborg, 2025 WL 1911338, at *4–5.

Accordingly, the Court **DISMISSES** EFL's second and third causes of action.

### 3.    Implied Covenant of Good Faith and Fair Dealing Claim (Fifth Cause of Action)

EFL's fifth cause of action for breach of the implied covenant of good faith and fair dealing fails for reasons independent from the FAAAA preemption issue.  Namely, the claim does not identify a discrete contractual gap for the implied covenant to fill, and the claim is duplicative of the breach of contract claim.

Under Delaware law, the implied covenant "attaches to every contract by operation of law."  Pacira Biosciences, Inc. v. Fortis Advisors LLC, 2021 WL 4949179, at *12 (Del. Ch. Oct. 25, 2021).  But the doctrine is limited: it "should only operate . . . where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer."  Dawson v. Pittco Capital Partners, L.P., 2012 WL 1564805, at *25 (Del. Ch. Apr. 30, 2012).  Thus, the implied covenant is a gap-filling tool, not a mechanism for imposing obligations the parties did not include in their agreement.  See Nemec v. Shrader, 991 A.2d 1120, 1125 (Del. 2010).

---

[3] EFL's gross negligence claim also fails for an independent reason: the FAC does not plead sufficient facts to sustain it.  Under Delaware law, gross negligence requires an "extreme departure" from the ordinary standard of care, but the FAC alleges the same conduct underlying both the negligence and gross negligence claims, with no additional facts alleged to support the gross negligence theory.  See FAC ¶¶ 67–97.  EFL points to two factual allegations that it contends elevate the conduct to gross negligence – the insider theft and data breach, and Uber's alleged failure to implement corrective measures after the first theft.  Opp'n at 13.  Neither is sufficient, because the insider theft and data breach allegations consist of bare assertions devoid of factual backing, and the failure of Uber Freight to improve its practices after the first theft, while relevant to negligence, does not by itself represent an extreme departure from the ordinary standard of care.

United States District Court
Northern District of California

Here, the Agreement is not silent on the subject matter of cargo theft. Cargo loss and theft are expressly addressed in sections 6 and 8.1 of the Agreement. Section 6 allocates responsibility for cargo loss to the motor carrier and disclaims any liability by Uber Freight. FAC, Ex. A at §6. Section 8.1 caps damages at $20,000. Id. at § 8.1. These provisions make an express representation about who bears the risk of cargo loss, and the implied covenant cannot be used to undo these representations.

The implied covenant claim also fails because it is wholly duplicative of the breach of contract claim. Under Delaware law, a plaintiff "cannot assert a claim for breach of the implied covenant of good faith and fair dealing that is based on exactly the same acts which are said to be in breach of express covenants." Mosiman v. Madison Cos., LLC, 2019 WL 203126, at *3 (D. Del. Jan. 15, 2019). Under the contract claim, EFL alleges that Uber Freight "materially breached its contractual obligations" by "failing to ensure or take reasonable steps to ensure that its online vendor system was secure" and by failing to "vet the vendors, carriers and third parties who had access to its system." FAC ¶ 61. As part of the implied covenant claim, EFL alleges that Uber Freight breached the implied covenant "by failing to implement and maintain safeguards . . . in its carrier platform to prevent fraud, theft, and impersonation of legitimate carriers" and by "failing to properly vet and monitor carriers, vendors, and agents." FAC ¶ 108. The allegations are materially identical. EFL responds that its implied covenant claim addresses contractual "gaps" that Uber Freight failed to fill in good faith, but this characterization is at odds with the FAC itself which frames the implied covenant claim as arising from the same acts and omissions as the breach of contract claim.

Accordingly, the Court **DISMISSES** EFL's fifth cause of action.

### D.     Leave to Amend

The Supreme Court has granted certiorari in Montgomery v. Caribe Transport II, LLC, 124 F.4th 1053 (7th Cir. 2025), cert. granted (Oct. 3, 2025). That case directly implicates the scope of FAAAA preemption and the validity of the safety exception recognized in Miller v. C.H. Robinson Worldwide, Inc., 976 F.3d 1016 (9th Cir. 2020). A

19

decision is expected in June 2026.  Because FAAAA preemption is the primary basis for dismissal of EFL's second, third, and fifth causes of action, and because the governing preemption framework may materially shift, dismissal with prejudice on preemption grounds would be premature.

Accordingly, the Court **DISMISSES WITH LEAVE TO AMEND**.  EFL may file a second amended complaint within thirty days of the Supreme Court's decision in Montgomery.  However, if EFL chooses to do so, it must provide a viable factual and legal basis for claims not otherwise barred by the Court's independent state and federal law analysis.  Any amended complaint must avoid re-alleging claims and theories rejected by the Court on independent, non-FAAAA grounds.  Those identified deficiencies are not remedied by a change in preemption law.

**IT IS SO ORDERED.**

Dated: March 31, 2026

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

20